the plausibility of competing explanations is exactly the task to be performed by a rational jury, considering a case presented by competent counsel on both sides. We remand to the district court with instructions to issue a writ in conformity with this opinion, so that such a trial may take place.

### F.  Appellate Counsel

Because we grant the writ on the grounds stated in section E, we need not consider the claims of ineffectiveness of appellate counsel.

### III

For the foregoing reasons, we **REVERSE** the district court insofar as it grants the writ based on insufficiency of the evidence. We **AFFIRM** that a violation of petitioner's rights under the Sixth Amendment has occurred. We therefore grant a conditional writ of habeas corpus, giving the State of Michigan one hundred twenty days in which to provide Matthews a new trial or to release him.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2003 FED App. 0045P (6th Cir.)
File Name:  03a0045p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LORENZO MATTHEWS,
          *Petitioner-Appellee,*

          *v.*                                      No. 00-1447

JOSEPH ABRAMAJTYS,
Warden,
          *Respondent-Appellant.*

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No.  98-73319—Arthur J. Tarnow, District Judge.

Argued:  August 3, 2001

Decided and Filed:  February 10, 2003

Before:  BOGGS and DAUGHTREY, Circuit Judges;
WEBER, District Judge.[*]

_____

[*] The Honorable Herman J. Weber, United States District Judge for Southern District of Ohio, sitting by designation.

---

**COUNSEL**

---

**ARGUED:** Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, HABEAS CORPUS DIVISION, Lansing, Michigan, for Appellant. Nicholas Smith, Northville, Michigan, for Appellee. **ON BRIEF:** Laura Graves Moody, OFFICE OF THE ATTORNEY GENERAL, HABEAS CORPUS DIVISION, Lansing, Michigan, for Appellant. James Sterling Lawrence, Detroit, Michigan, for Appellee.

---

**OPINION**

---

BOGGS, Circuit Judge. Petitioner Matthews was convicted by bench trial in 1986 of three counts of first-degree murder and one felony firearm count. Having unsuccessfully pursued his appeals through the Michigan state courts, Matthews filed a series of post-conviction motions with the state courts beginning in 1995. His last such motion was denied by the Michigan Supreme Court on December 30, 1997. In July 1998, Mathews sought a writ of habeas corpus under 28 U.S.C. § 2254; his petition is thus governed by AEDPA. The district court granted the writ on several grounds, including insufficiency of evidence and ineffectiveness of counsel in violation of the Fourteenth and Sixth Amendments. The court ordered Matthews's release, pending only the resolution of this appeal brought by the respondent, Warden Abramajtys. The respondent argues, *inter alia*, that the district court erred in its substantive analysis and that Matthews's petition is untimely under AEDPA's one-year time limit because the "gaps" between Matthews's various filings with the Michigan courts do not toll the running of the statute under § 2254(d)(2). We reverse in part and affirm in part, and we affirm the grant of the writ on the grounds of ineffective assistance of counsel.

Matthews did own a Georgetown jacket, it did add a small amount of evidence against Matthews, but that additional evidence was not inadmissible, and was not necessary for the state's case to pass the *Jackson* test, as we have just indicated.

*E. Trial Counsel*

The district court was correct in granting habeas based on ineffective assistance of trial counsel. Fundamentally, the lawyer in this case, at best, occupied a space next to his client but did not assist him. He did nothing to present potential alibi witnesses, whose testimony would have been quite useful, even if not conclusive. The trial court pretty clearly pointed out to counsel what he needed to do in order to be even minimally effective, after the denial of his motion for directed verdict: present some defense witnesses.

In addition, Daggs had admissible evidence that would have permitted him to emphasize possible flaws in the state's case, such as the discrepancy in height between Matthews and the observations made by witnesses, the failure of a number of witnesses to identify Matthews in a showup, the fact that he never attended Cody High School, and the very close timing required, given the evidence of alibi witnesses. He did not present any of that evidence, however. Finally, Daggs appears to have actively barred his client from introducing this alibi witness defense, despite the urgings of the trial court. In short, not only did Daggs not affirmatively assist his client, he appears to have furnished a net negative to the defense. Under the standard of *Strickland v. Washington*, 466 U.S. 668, 687-91 (1984), this is a sufficient judgment to meet the standard for incompetence. As shown above, the evidence was not overwhelming, so that there is a reasonable probability of a different outcome with effective counsel. *Id.* at 693-96.

Of course, a "reasonable probability" does not mean a certainty, or even a preponderant likelihood, *id.* at 694, of a different outcome, nor, even more, that no rational juror could constitutionally find Matthews guilty. The actual resolution of the conflicting evidence, the credibility of witnesses, and

great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of a set of specifically enumerated felonies. *People v. Carines*, 460 Mich. 750, 754, 597 N.W.2d 130, 136 (1999).

A rational fact-finder could find that the evidence presented to the state court was sufficient to meet each of these elements. Fundamentally, this is an identity case. There clearly was a killing (or killings), under circumstances (eight gunshots) that would create a very high risk of great bodily harm, and committed in the course of a robbery. Here, the most damning evidence against Matthews is his possession of Baxter's ring, under circumstances such that a rational fact-finder could determine that Matthews knew that the ring belonged to Baxter and that Baxter had been murdered. Thus, his possession, coupled with his easily disbelieved arguments explaining that possession, is strongly inculpatory. His knowledge of the Baxters, his presence near the scene before and after the time of the crime, and his identification by Marilyn Prior, equivocal though it was, could have been believed by a rational juror. That rational fact-finder cannot be taxed with knowing the potentially contrary evidence, such as the alibi witnesses and the full extent of the eyewitness discrepancies, as they were not presented. Such evidence may be persuasive to actual fact-finders, but on the other hand it may not be. At this stage, it is not for us to judge that outcome. The issue before us is whether the state trial court erred in not granting a directed verdict, and under the *Jackson* standard it did not so err.

### D.  The Mug Shot

The issue of the introduction of the mug shot evidence was basically inconsequential, in that little that is harmful or inappropriate was presented to the judge that did not otherwise properly become known. The defendant's lawyer told the court that Matthews had been arrested before, which is the primary inadmissible evidence possibly conveyed by a mug shot. To the extent that the mug shot showed that

## I

In the summer of 1984, Bruce Baxter brought 27 diamonds to the Kayanan Jewelry Co. in Oak Park, Michigan and commissioned the design and manufacture of a gold ring in which to set the jewels. When the ring was completed, the diamonds were arranged in the shape of a trisected circle, recognizable as the logo of the Mercedes-Benz automobile company. Krikor Oknayan, one of the ring's makers, testified in 1986 that although the jewelers had retained the mold, no other rings like Baxter's had been made.

Petitioner was convicted by the State of Michigan of participating in the triple homicide of Baxter, his wife Marilyn, and their friend and neighbor Robert Williams. On the morning of December 12, 1985, the three were shot to death, apparently by multiple assailants, at Baxter's residence on Westwood Street in Detroit. There were no witnesses to the killings of the Baxters in their basement; the only person left alive in the Baxters' house was their orphaned daughter Twyla, a 14-month-old infant found, by police, uninjured in her upstairs nursery. Police found Bruce Baxter with his hands bound behind his back, shot four times with three different weapons. Marilyn Baxter was found nearby, still in her nightclothes, also dead of four gunshots. Although there was no evidence of forced entry, the house had been looted, including the secret drawer beneath the carpet where Bruce hid his money. The ring, and other various other valuables, were missing from the house.

Robert Williams had apparently encountered the assailants when he arrived at the Baxter household at approximately 8:25 A.M., had been shot and had fled through his own yard into the yard of the Rev. James Ellison, where he was shot again and collapsed. Ellison witnessed the final moments of Williams's life. After Ellison heard the shots, he saw a figure bending over Williams, lifting Williams's body as if to "check him out." When Ellison confronted this individual and asked what was going on, the figure stared at Ellison for a moment, concealed a dark object that had been in his hand,

and ran away. Ellison indicated that this man was wearing a light blue "puffy jacket" and was 5'6" in height. Ellison testified the man was not petitioner Matthews. Ellison spoke briefly to Williams before he lost consciousness and died, attempting to comfort him, but all Ellison could comprehend of Williams's responses was "two [garble] guys."

Moments thereafter, three men ran from Westwood Street turning onto Orangelawn Street, and turning again to run down Minock Street, parallel to Westwood. Several boys between the ages of 8 and 12, on their way to school at the time, were able to describe these men as armed with handguns. The boys' descriptions were hampered by the fact that, familiar with, and alerted to, the sound of gunshots, they all wisely took cover by throwing themselves on the ground or ducking behind trees and bushes.

The evidence about the incident that six of the boys gave at petitioner's trial has been extensively detailed by the district court in its published opinion, *Matthews v. Abramajtys*, 92 F. Supp. 2d 615, 621-22 (E.D. Mich. 2000), and need only be summarized here. While the boys' testimony on the route and number of the men was consistent, their descriptions varied to some extent. Generally, however, the boys remembered one as wearing a gray and blue "Georgetown" jacket and another as wearing a red "Sixers" jacket; the descriptions of the third figure were more vague, although some boys remembered him as hooded. All of the boys who testified claimed to have been unable to see the faces of the three men. Over the objection of the defendant, the prosecution introduced into evidence a mug shot of Matthews taken 11 months earlier, which shows him wearing a dark blue "Georgetown" jacket.[1]

---

[1] The testimony of the children was somewhat equivocal as to whether the Georgetown jacket they saw was gray with blue letters or blue with gray letters, although the former was supported by two boys; another said merely the jacket was "blue and gray."

has not acted with reasonable diligence as a matter of law.'" *Rideau v. Whitley*, 237 F.3d 472, 477 (5th Cir. 2000), *quoting Walters v. Scott*, 21 F.3d 683, 686-87 (5th Cir. 1994).

Here, the state relies primarily on the extensive passage of time, even though most of the parties most crucial to the ineffectiveness claim, in particular, are still available and active. There is no allegation of the loss of any particular crucial witness. In addition, petitioner has been actively engaged in litigation for the past seven years. Although the initial petition did not occur until a number of years after the conclusion of direct review in the Michigan courts, that alone is insufficient to establish the lack of due diligence required for the dismissal of an otherwise timely petition. Thus, the district court correctly denied the motion to dismiss the petition based on laches.

## C. Insufficient Evidence

A habeas court reviews claims that the evidence at trial was insufficient for a conviction by asking whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Scott v. Mitchell*, 209 F.3d 854, 885 (6th Cir. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). A reviewing court does not reweigh the evidence or redetermine the credibility of the witnesses whose demeanor has been observed by the trial court. *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983). It is the province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony. *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992). An assessment of the credibility of witnesses is generally beyond the scope of federal habeas review of sufficiency of evidence claims. *Gall v. Parker*, 231 F.3d 265, 286 (6th Cir. 2000). The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim. *Ibid.*

Under Michigan law, the elements of felony murder are: (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or

Michigan Court of Appeals until March 13, 1997. In addition, his petition for leave to appeal to the Michigan Supreme Court was pending before that court for more than eight months of the intervening sixteen-month period. Thus, if the time for filing a federal petition was tolled during the time that Matthews could have filed an appeal, which he ultimately did, his petition is timely. The Supreme Court has recently conclusively determined this question in *Carey v. Saffold*, 536 U.S. 214, 122 S. Ct. 2134 (2002). The court specifically held that the word "pending" in the AEDPA tolling provision, § 2244(d)(2), indeed "cover[s] the time between a lower state court's decision and the filing of a notice of appeal to a higher state court." *Id.*, 122 S. Ct. at 2136, 2138. This is exactly what happened in our case, and the *Saffold* decision conclusively disposes of this argument by the warden. Petitioner's federal habeas petition was timely.

## B.  Defenses

The warden also argues that in some way the delay in filing a timely habeas petition should be considered as laches, permitting the dismissal of the petition. Prior to the enactment of AEDPA, there was no specific time limitation for the filing of a federal habeas petition. Rule 9(a) of the Rules Governing Section 2254 cases established a standard allowing the dismissal of unduly delayed habeas petitions.

It is not clear how that rule should be enforced following the enactment of a specific time limitation in AEDPA. Other than one district court case applying a particular Second Circuit doctrine that we have not adopted and which shortens even the AEDPA one-year standard, *see Peterson v. Dempskey*, 107 F.3d 92 (2d Cir. 1997), we have found no cases applying a laches or laches-type defense to a petition timely filed under AEDPA. *See Alexander v. Keane*, 991 F. Supp. 329, 332-34 (S.D.N.Y. 1998). Even under such circumstances, the state "bears a heavy burden under Rule 9(a) to '(1)  make a particularized showing of prejudice, (2)  show that the prejudice was caused by the petitioner having filed a late petition, and (3)  show that the petitioner

Matthews was a resident of this neighborhood of Detroit, and was acquainted with Mr. Baxter. Testimony established that he had met with Baxter for an hour in the basement of Baxter's home two days before the murders. Like Bruce Baxter, but at an apparently lower volume, Matthews was involved in the buying and selling of jewelry. On the morning of December 12, Matthews had been seen on Orangelawn, walking in the direction of the Baxter residence, wearing blue jeans and a "dark jacket." Off-duty police officer Gilbert McReynolds testified that this occurred around 8:00 A.M. Ms. Marilyn Prior also saw the three assailants run by her home near the intersection of Minock and Orangelawn at 8:25 A.M. She only glanced at the men, and could not be positive, but testified that she thought one of them might be Matthews, whom she claimed to be familiar with from the neighborhood and because he went to Cody High School with her nieces.[2]

By December 14, two days later, petitioner was in Illinois, where he called his girlfriend Rose Marie Marks. Marks testified that when Matthews returned to Detroit sometime between December 16 and December 18, he showed her Baxter's ring. Matthews apparently told Marks that he wanted to purchase this ring, and attempted (unsuccessfully) to convince her to give him seven hundred dollars for this purpose. Other testimony established that petitioner behaved in a fashion inconsistent with this status as prospective purchaser. In the days following his display of the ring to Marks, Matthews took the ring to jeweler Brian Berry, to whom he sold it for $750 and a gold rope necklace, a "week before Christmas." Berry, as well as others, averred that at

---

[2]In fact, however, the government does not contest petitioner's current evidence, available at the time of trial but not introduced, showing him to have had only a sixth-grade education, and never to have attended Cody (or any other) High School.

this time the ring was far more valuable, worth $12,000 to $15,000.[3]

Seven days earlier, on the evening of December 11, the ring had still been in Baxter's house. The Baxters employed their nephew, Jonathon Hudson, as babysitter and housekeeper. One of Hudson's "perks" was that he was allowed to wear the ring as he went about his daily chores, which Hudson enjoyed doing, and did almost every day because he felt that it looked so "sharp."[4] Hudson testified that he was working the night before the murders putting up Christmas decorations and that he placed the ring back in its normal place that evening. Hudson left the Baxter house at approximately 11:30 P.M.

After petitioner was arrested, the above set of facts were presented by the State to the Detroit Recorder's Court, where Matthews waived his jury right and received a bench trial. Matthews was represented at this trial by attorney Leroy Daggs. Daggs premised his defense on the theory that because there was no positive identification of Matthews at the crime scene and no physical evidence tying him to the murders, the government's case would fail. Daggs cross-examined Marilyn Prior to emphasize the equivocal nature of her identification, but did not cross-examine any of the child witnesses to develop their description of the apparent perpetrators.

Lorenzo Matthews is at least 6'4" inches in height, and the earlier descriptions of the height of the fleeing men by both Pryor and the children seemed to be inconsistent with this stature. Not surprisingly, the prosecution did not develop this height point during direct testimony, either. That Daggs recognized this issue is evidenced by his use of it during

---

[3] Baxter had paid Kayanan eight hundred dollars to have the ring made.

[4] Although Baxter wore the ring frequently, he did so only when he went out for a night on the town, rather than during his day job at Delta Airlines.

habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

28 U.S.C. § 2254(d).

*Williams v. Taylor*, 529 U.S. 362 (2000), outlines the degree to which federal habeas courts should defer to state court decisions. The Court held that, in order for the writ to issue, a state-court decision must be contrary to Supreme Court precedent in the sense that "the state court arrive[d] at a conclusion opposite to that reached by this Court on a question of law. . . [or] the state court confront[ed] facts that are materially indistinguishable from a relevant Supreme Court precedent and arrive[d] at a result opposite to ours." *Id.* at 405. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable" in light of the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision. *Id.* at 411-12.

*A. Timeliness*

Matthews's federal habeas corpus petition was timely filed. At the time AEDPA took effect, Matthews's state-court petition for post-conviction relief had been denied, but the one-year period within which he could appeal that determination had not yet run out. Within the one-year period, he filed such an appeal, which was not denied by the

Michigan Court of Appeals on March 13, 1996, which was subsequently ruled defective on August 21, 1996. However, he filed another application for leave to appeal on September 27, 1996, which was treated on the merits and denied by the court of appeals on March 13, 1997. This application was timely under Michigan law. He then filed an application for leave to appeal with the Michigan Supreme Court on April 8, 1997, which was denied on December 30, 1997.

Matthews's petition for habeas corpus was received on July 28, 1998. After hearing the evidence of the witnesses discussed above, along with that of petitioner, and attorney Daggs, the district court granted the writ on four grounds: (1) that the admission of the mug shot was a denial of due process by introducing evidence of "other crimes" before the factfinder, (2) that Daggs had rendered constitutionally ineffective assistance, (3) that Matthews's appellate counsel, by insufficiently pursuing an ineffective assistance of trial counsel claim, was himself constitutionally ineffective, and (4) that there was insufficient evidence for any rational finder of fact to find Matthews guilty of homicide. Respondent Abramajtys appeals, asserting that the habeas petition was untimely filed, was barred by the equitable doctrine of laches, and contained an unexhausted claim regarding the failure to challenge Marilyn Pryor's erroneous placement of petitioner at Cody High School, and that the district court erred as to all four bases for its grant of relief.

## II

### Standard of Review

In the appeal of a habeas corpus decision under § 2254, legal conclusions are reviewed de novo and findings of fact are reviewed for clear error. *See DeLisle v. Rivers*, 161 F.3d 370, 380 (6th Cir.1998). Matthews's petition was filed in May 1998. Its review, therefore, is governed by the provisions of the AEDPA as they apply to § 2254. *Harris v. Stovall*, 212 F.3d 940, 942 (6th Cir. 2000). The relevant section of § 2254(d) provides that an application for a writ of

closing argument, but he felt no need during the trial to get the witnesses to state in a positive way that the people they saw *could not have been* Matthews, relying instead on their inability to be sure that it *was* Matthews. Matthews had asked Daggs to arrange for a showup identification. Daggs demurred from doing this for some time, but eventually a photo showup was performed. A child witness, Deon Corbett, participated in the showup and stated that none of the individuals shown had been among the fleeing men. Daggs chose not to call Corbett to the stand, although he appears to have been aware of the results of the showup, as he had to be forestalled from telling the court about the results.

Indeed, Daggs called no witnesses of his own, although he was apparently in contact with various members of Matthews's family who had indicated a willingness to testify. At the district court's evidentiary hearing, Matthews's sister and mother testified that they had been ready to state that petitioner had left their common home shortly after 8 A.M. in the company of his red pit bull, en route to his brother's house. They remembered telling Daggs this, and being told by Daggs that he would call them to testify. Sandra Elliott, at that time Matthew's sister-in-law, told the district court that Matthews had arrived with his dog at her home at 8:20 or 8:25 A.M., "right before my kids went to school." After being informed of this, Daggs told Ms. Elliott he "would get back to her."

Daggs's plan was to win on a directed verdict. When the government closed, Daggs argued his case to the bench, pointing out the lack of identification and anything placing Matthews any closer than the general neighborhood. As to the ring, Daggs argued that "no one knows" how it came into Matthews's possession and that the ring might well have been removed before the murders. Daggs also questioned whether Matthews might not have sold the ring to Berry before December 12, since Berry's recollection of the date of the sale, "a week before Christmas," was inexact.

The court denied Daggs's motion without deliberation. The court pointed out that the testimony had been that Matthews was in possession of the ring after the murders, presumably referring to the statement of Matthews's girlfriend.[5] And it was the possession of this ring that, in the court's view, tied Matthews to the crime scene as one of the fleeing men. The court concluded that a "juror could find and probably would find on the evidence that I've outlined the defendant participated [in the murders]." The court then asked Daggs to proceed.

The defense instead rested. The record then discloses that the court summoned counsel to the bench and had a discussion. The court's statement is worth quoting at length:

> I'm aware, as is the prosecutor and the defense counsel, of course, no person accused of a crime such as the defendant need [sic] to prove his innocence. It is not my desire the defendant put in a defense. It is, however, as I contemplate the opinion I gave in reasons to the defense's motion for a directed verdicted [sic], a case where the defendant may wish to give some thought to whether or not he wishes to proceed in the manner announced by his counsel as resting at this stage. I'm perfectly willing the matter be argued. And I come to a conclusion on the basis of what is presented.

Defense counsel agreed he would give "some thought to the matter" of mounting a defense.

Daggs's defense consisted of recalling three of the government witnesses. He recalled Marilyn Prior and again elicited the fact she was unable positively to identify Matthews; he also elicited testimony that, as far as Prior remembered, the three men appeared to be the same height. Daggs recalled Brian Berry and attempted to highlight

---

[5]Daggs did not explain how Marks could have seen the ring in Matthews's possession after December 14, when it was supposedly sold to Berry before December 12.

uncertainty as to the date of the ring sale. Finally, Daggs recalled an autopsy technician, apparently for the purpose of highlighting uncertainty as to the time that the Baxters were shot. Then he rested. He presented a rambling closing argument in favor of reasonable doubt, pointing out that no witness had mentioned seeing a "big man" like his client. He also relied on testimony that Bruce Baxter normally left for work at 7:30 A.M. and, therefore, someone had to have been in the house before that time. As Matthews was seen out and about at 8:00 A.M., the person who detained Baxter was unlikely to have been Matthews. Daggs proposed that Matthews may have been acting as "middleman" for the ring, and need not actually have participated in its theft.

The trial court was unpersuaded by Daggs and found the overall assemblage of circumstantial evidence sufficient for conviction, discussing this evidence in detail as part of its decision, and noting that it "found no inconsistent circumstances relating to the defendant's participation." Matthews was sentenced to three concurrent life terms without parole, plus two years.

Matthews appealed, presenting several issues, including insufficiency of evidence and ineffective assistance of counsel. We elide most of the details of Matthews's unsuccessful odyssey through the Michigan state courts, addressed by the district court at 92 F. Supp. 2d at 623-24, as, with one minor exception, the Warden does not assert that Matthews failed to exhaust his claims. However, the respondent does claim that Matthews's motions for post-conviction relief were insufficient to toll AEDPA's one-year statute of limitations. *See Matthews v. Abramajitys*, 39 F. Supp. 2d 871 (E.D. Mich. 1999) (rejecting this claim).

It may therefore be useful to review briefly the sequence of events. Matthews filed a motion for relief from judgment with the trial court raising eight grounds for relief, including insufficient evidence and ineffective assistance of counsel. The trial court denied the motion on September 27, 1995. Matthews filed an application for leave to appeal to the