NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0756n.06

No. 10-5257

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

*Jul 13, 2012*

LEONARD GREEN, Clerk

PATRICK THURMOND,  )
 )
    Petitioner-Appellant,  )  ON APPEAL FROM THE
 )  UNITED STATES DISTRICT
    v.  )  COURT FOR THE MIDDLE
 )  DISTRICT OF TENNESSEE
HOWARD CARLTON, Warden,  )
 )
    Respondent-Appellee.  )
 )

BEFORE: BATCHELDER, Chief Judge, and GRIFFIN, Circuit Judges; and COHN, District Judge.[*]

GRIFFIN, Circuit Judge.

Petitioner Patrick Thurmond appeals the district court's denial of his petition for a writ of

habeas corpus. We affirm.

I.

We borrow our statement of the underlying facts from the decision of the Tennessee Court

of Criminal Appeals affirming Thurmond's convictions on direct appeal.

> On September 8, 1994, [the victim] worked as a housekeeper for the Drury Inn. At
> about 9:00 a.m., while cleaning the bathroom of a fourth-floor room, she heard a
> noise from the sleeping area. She found a man standing in the room's sleeping area.
> He wore a black shirt, long black shorts, black gloves, and held a pistol. The man
> tried to speak to [her], but she does not understand any English.

---

[*]The Honorable Avern Cohn, Senior United States District Judge for the Eastern District of
Michigan, sitting by designation.

When [the victim] tried to escape, [the man] grabbed her by the shirt and put the gun to her head. Then, he threw her on the bed and put a pillowcase over her head. He raped her . . . Trial testimony established that the attack lasted between one and 1 1/2 hours. [The victim] later identified [Thurmond] as her attacker.

The assault ceased when fellow Drury Inn staff members, Leah Adams and Lourdes Rivera, banged on the door and called out to [the victim]. [Thurmond] motioned for [the victim] to re-dress while he did the same. While Adams and Rivera tried to open the hotel room door, [Thurmond] opened the door and pushed his way between the women.

Rivera chased [Thurmond] down the steps and around the building to a restaurant parking lot behind the hotel. When she accused him of raping [the victim], [Thurmond] replied, "she gave it to me." Rivera watched [Thurmond] get into a gray Chevrolet Corsica and memorized the license plate number as [Thurmond] drove away. Rivera related the number "099 JKB" to a hotel manager who, in turn, related it to police. When asked by Detective Danny Baxter for the number from memory, Rivera related the number "099 JKF." Baxter found that "099 JKF" was registered to the wrong type of car, but confirmed that "099 JKB" was the plate number of a Corsica registered in [Thurmond's] name.

Earlier that morning, Lynn King, a housekeeper at nearby Days Inn[,] saw a man, wearing all black clothing, roaming the halls of that hotel. She and other housekeepers had seen the same man, in the same clothing, lingering around the hotel a couple of weeks earlier. King identified [Thurmond] as the man she saw.

*State v. Thurmond*, No. 01C01-9802-CR-00076, 1999 WL 787524, at *1–2 (Tenn. Crim. App. Oct. 5, 1999). The State of Tennessee charged Thurmond with aggravated burglary, two counts of aggravated rape, attempted aggravated rape, and aggravated sexual battery.

The case was tried to a jury. The state showed that the victim and Rivera both identified Thurmond as the attacker during a photographic line-up the day of the rape, and that King identified Thurmond as the man she saw wandering the halls of a nearby hotel (where she worked) the morning of the rape and weeks earlier. These three women also identified Thurmond at trial. Adams, who

was unable to identify Thurmond from the line-up, despite seeing him face-to-face for a few seconds when he opened the hotel-room door, nevertheless identified him at trial (over a year later). The state also showed that Rivera identified the license plate number of the attacker's car, which was registered to Thurmond. Finally, the state offered that fibers found on the victim's clothing were consistent with those found on clothing seized from Thurmond's home. Thurmond did not testify. The jury found him guilty on all five counts. The Tennessee Court of Criminal Appeals affirmed, and the Tennessee Supreme Court denied leave to appeal.

Thurmond sought relief in state post-conviction proceedings, but was largely unsuccessful. (*See id.*) He then filed for habeas relief in federal court, raising claims relating to trial-court error and ineffective assistance of counsel. *See* 28 U.S.C. § 2254. The district court denied relief, but issued a certificate of appealability with respect to Thurmond's claim of ineffective assistance of counsel. Thurmond timely appealed.[1]

II.

We review the district court's habeas decision de novo. *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010). Thurmond filed his petition in 2006, so the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") applies. AEDPA permits habeas relief only when a state court's

---

[1]While this appeal was pending, Thurmond asked us to expand the certificate of appealability and consider his claim that a suggestive photographic line-up produced unreliable out-of-court identifications and led to unreliable in-court identifications, thereby violating his right to due process. We declined his request, finding undebatable the district court's determination that the claim was procedurally defaulted. We therefore do not address this claim here. *See Bugh v. Mitchell*, 329 F.3d 496, 502 n.1 (6th Cir. 2003).

merits adjudication resulted in a decision that is "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). "Clearly established Federal law" refers to the Supreme Court's holdings as of the time of the relevant state-court decision. *Lundgren v. Mitchell*, 440 F.3d 754, 763 (6th Cir. 2006). "In order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous[;] . . . [it] must have been 'objectively unreasonable.'" *Wiggins v. Smith*, 539 U.S. 510, 520-21 (2003) (internal citation omitted). The threshold for "unreasonableness" is "substantially higher" than it is for incorrectness, *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007), satisfied only when a state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 131 S. Ct. 770, 786-87 (2011).

III.

Thurmond claims he was denied the effective assistance of trial counsel when his lawyer: (1) failed to investigate and later present an alibi defense; and (2) failed to object to the admission of hearsay testimony and physical evidence.

A.

To succeed on a claim of ineffective assistance of counsel, a defendant must show that his lawyer's performance was deficient and that the deficiency prejudiced his defense. *Strickland v.*

*Washington*, 466 U.S. 668, 687 (1984). Both components of the inquiry are mixed questions of law

and fact, *id.*, and are therefore reviewed under AEDPA's "unreasonable application" prong when that

statute applies. *Railey v. Webb*, 540 F.3d 393, 397 (6th Cir. 2008).

To establish the first component of an ineffective-assistance claim, a defendant must show

that his lawyer's performance "fell below an objective standard of reasonableness" as measured by

"prevailing professional norms." *Strickland*, 466 U.S. at 687–88. Judicial review of a lawyer's

performance is "highly deferential" and subject to a rebuttable presumption that the conduct fell

within "the wide range of reasonable professional assistance." *Id.* at 689. A defendant's burden is

to "overcome the presumption that, under the circumstances, the challenged action might be

considered sound trial strategy." *Id.* (internal quotation marks omitted). Although "strategic choices

made after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable[,]" those "made after less than complete investigation are reasonable precisely to

the extent that reasonable professional judgments support the limitations on investigation." *Id.* at

690-91. The performance component itself is deferential; it becomes doubly so when AEDPA

applies. *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citing *Yarborough v. Gentry*, 540 U.S.

1, 5-6 (2003) (per curiam)); *see also Harrington*, 131 S. Ct. at 788 ("When § 2254(d) applies, the

question is not whether counsel's actions were reasonable. The question is whether there is any

reasonable argument that counsel satisfied *Strickland*'s deferential standard.").

To establish prejudice from his lawyer's deficiency, a defendant must show a "reasonable

probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

different." *Strickland*, 466 U.S. at 694. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." *Id.* "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 131 S. Ct. at 792. A verdict or conclusion strongly supported by the record is less likely to have been affected by errors than one with weak record support. *See Strickland*, 466 U.S. at 696.

## B.

Thurmond first argues that his lawyer was ineffective by failing to fully investigate and later present an alibi defense. He claims he told his lawyer well before trial that Delores Grayson, his friend and employer, would have testified that Thurmond was working at Grayson's store when the victim was attacked. During post-conviction proceedings, the state court heard testimony from various individuals regarding this claim. Because that testimony gives context to the state court's decision on Thurmond's claim, we summarize it below in some detail.

## 1.

Grayson testified that she hired Thurmond to work as a security guard at a video store she managed. The morning of the rape was also Thurmond's birthday, and Grayson called Thurmond at his home before 9:00 a.m. to ask if he would open the store so she could run an errand. Thurmond obliged, and Grayson went to the mall to buy him a birthday present. On her return to the video store, she stopped at a carwash around 9:30 a.m. Her car battery died shortly after the wash, so she called the video store and asked Thurmond to pick her up, which he promptly did. Thurmond stayed at the store until 2:00 or 3:00 that afternoon.

Grayson further testified that she told Thurmond's lawyer, Terrance McNabb, that she could testify, and McNabb responded that he would "probably" use her testimony at trial. When she showed up the morning of trial, however, McNabb dismissed her without an explanation. Grayson acknowledged that she did not immediately come forward, despite believing the police had the wrong suspect. She apparently believed Thurmond's lawyer would contact her if she could help.

McNabb testified next. He recalled that, at Thurmond's urging, he asserted his intent to present an alibi defense in response to the prosecutor's discovery request. However, when McNabb spoke with Grayson prior to trial, the information she provided regarding Thurmond's whereabouts on September 8 was inconsistent with what Thurmond told him. McNabb could not recall specifically what the inconsistencies were, testifying that Grayson "was inconsistent about the timing," that the times "didn't jive," and that Grayson "couldn't really tell me with any degree of accuracy about times." He also said:

> [B]asically when I talked with her and remembering what Mr. Thurmond had said, I just didn't believe her, I didn't think she was credible with regard to that. I don't think she was making up a story, she just didn't seem to be credible. And I told Mr. Thurmond – we talked about calling her. And I recommended that I felt it would do more harm than good given what she said.

McNabb mentioned further that, from an ethical standpoint, he did not feel he could call her to testify. He stopped short, however, of saying he thought Grayson was lying.

As for Thurmond's testimony, McNabb gave two reasons for advising him not to testify: (1) inconsistencies in his story, and (2) his extensive criminal record. Although he offered no specific examples of inconsistencies, he did state that Thurmond's story was "totally inconsistent with what

he said to start off with . . . [a]nd . . . I didn't feel like it was in his best interest to get on the stand

and get caught in a contradictory trial with a skilled attorney prosecuting the case that was going to

cross[-]examine him." He elaborated:

> You know, on an alibi if a person says he's at point A at a certain . . . time and he's
> got a witness that says he's there, that's one thing. And if the person says he's there
> and the other witness says, I can't recall, it may have been over here at another place
> and time, that's inconsistent. Basically, that's what I remember. You know, I can't
> sit here and tell you the exact inconsistencies. But needless to say, [there] were a lot
> or I would've not made the recommendation to Mr. Thurmond that he shouldn't
> testify.

With respect to Thurmond's criminal record, McNabb could not recall details, but thought

it included one or two additional rape convictions and possibly some others. He acknowledged that

it would have been prudent to seek a pretrial ruling on the admissibility of the prior rape conviction

before advising against Thurmond's testimony, but stated that his recommendation would have been

the same regardless of Thurmond's criminal record. In McNabb's view, he had offered the jury all

of the inconsistencies in the eyewitness identifications and "felt like there may be a possible

reasonable doubt issue that could be raised by that," and that, if Thurmond testified "and these things

were brought up[,] it could have turned it around and . . . caused more problems[.]" McNabb also

believed "[t]here was some reasonable doubt on the sperm putting him there."[2]

Cross-examination further illuminated McNabb's reasons for advising against an alibi

defense. McNabb agreed that Grayson would have placed Thurmond in the same part of town as the

---

[2]Sperm found on the hotel bedspread did not match Thurmond's DNA profile, and sperm
found on a vaginal swab of the victim was insufficient for DNA testing.

rape, making it less likely that the defense would succeed. "[I]t wasn't like [Thurmond] was in Alabama and Ms. Grayson was going to verify [that]; . . . [the video store] was fairly close in proximity [to] where [the rape] happened." Timing, too, was a problem, as "it would have been possible for him to have done this and then get back [to work]." Furthermore, Grayson's testimony would have been that Thurmond was working at the video store at the time, which was inconsistent with what Thurmond's landlord and employer had told police when they searched Thurmond's room: Thurmond worked at Perry's Market for the landlord, not at the video store for Grayson.

Of final importance here, McNabb acknowledged that he filed a motion for new trial asserting his own ineffectiveness for not calling Grayson to testify. He explained that "[it was] an effort on my part to try to help Mr. Thurmond. You know, obviously I felt bad about his conviction. His father and I got to be fairly good friends and I felt sorry for the family[.]" He further stated that the motion was "probably inarticulately drawn up," and that he "should have probably said, failed to call defendant's alibi witness who *may have* establish[ed]" that he was working at the time of the attack, not that she *would have* done so. (Emphasis added.)

Thurmond testified last. He recalled telling McNabb "over and over" that he wanted Grayson to testify. Thurmond learned of McNabb's reservations about calling Grayson for the first time at the evidentiary hearing. He also recalled that McNabb advised him not to testify only because of his prior rape conviction. During cross-examination, Thurmond acknowledged that he told police upon his arrest that he worked as a cashier at Perry's Market. He explained that his job at the video store was new, and he did not want his new employer to know he had been arrested. He further

acknowledged that he lacked documentary evidence showing that he worked at the video store, explaining that he was paid in cash and records were not kept.

After hearing the testimony, the state trial court determined that McNabb's performance did not fall below professional norms. It fully credited his testimony that he saw inconsistencies in the stories Thurmond and Grayson told him regarding Thurmond's whereabouts, particularly as to the "timing of events that took place." *Thurmond v. State*, No. M2005-00214-CCA-R3-PC, 2006 WL 680924, at *9 (Tenn. Crim. App. Mar. 15, 2006) (quoting the trial court). It agreed with McNabb's belief that "admitting testimony by [Thurmond] and Ms. Grayson would have created serious credibility issues." *Id.* The Tennessee Court of Criminal Appeals also agreed, noting specifically that Grayson's statement about Thurmond working at the video store conflicted with Thurmond's own statement to police that he worked at Perry's Market at the time, and that McNabb did not believe Grayson was credible.

2.

Thurmond's success on his ineffective-assistance claim depends entirely upon whether McNabb believed there were inconsistencies in the testimonies of Thurmond and Grayson, and that Grayson was not credible. As we explain more fully below, if he had that belief, his decision not to call either witness to testify and to instead structure a defense around the inconsistent statements of the identifying eyewitnesses and absence of a DNA match was a sound trial strategy. And, given that belief, it was also reasonable for McNabb to decide not to further investigate an alibi defense. However, if McNabb did not find the stories problematic, and he had no other strategic reason for

not calling them at trial, he was likely ineffective, and a conclusion to the contrary would require an unreasonable application of *Strickland*. *See Bigelow v. Williams*, 367 F.3d 562, 570 (6th Cir. 2004) ("[T]he failure to call a known alibi witness generally would constitute ineffective assistance of counsel."); *Matthews v. Abramajtys*, 319 F.3d 780, 789–90 (6th Cir. 2003). Accordingly, we first consider the state court's determination regarding McNabb's belief.

We note first that the determination is one of historical fact that we deem true unless Thurmond shows otherwise with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see Ramonez v. Berghuis*, 490 F.3d 482, 490 (6th Cir. 2007) ("[I]n the context of a *Strickland* evidentiary hearing, it is for the judge to evaluate the credibility of the criminal defendant and the former defense counsel in deciding what advice counsel had in fact given to the defendant during his trial, and such findings are entitled to the Section 2254(e)(1) presumption."); *Bigelow*, 367 F.3d at 571 (explaining that a state-court finding that counsel was unaware of the existence of potential alibi witnesses before trial is presumed correct under § 2254(e)(1)).

The record, to be sure, could have supported a finding that McNabb's hesitation in calling Grayson and Thurmond was *not* based on inconsistencies in their statements, but rather negligence. McNabb was unable to articulate on his own any specific inconsistencies he perceived in Grayson's and Thurmond's statements, raising the possibility that he saw none. Such a finding would also be supported by the fact that Thurmond did not recall McNabb ever telling him about inconsistencies. McNabb's inability to be precise is also reasonably explained, however, by the fact that he was testifying, without notes, about conversations that took place over ten years earlier. And McNabb

testified that he and Thurmond *did* discuss McNabb's recommendation to not present Grayson's testimony. Also, that McNabb argued in a new-trial motion that he was ineffective for not calling Grayson could cut strongly against his testimony that he had ethical concerns in calling Grayson. The state court saw things differently, however, implicitly finding that McNabb either ignored his initial concerns when he filed the motion because, as he said, he felt bad about losing, or that his initial concerns did not loom as large in hindsight after the jury's verdict.

Further support for the state court's finding exists as well. At the time of the trial, McNabb had been practicing law for twenty-five years, and much of his practice involved criminal law. Although seasoned attorneys are not immune from making mistakes, McNabb's experience in criminal matters nevertheless provides some support for the state court's finding that McNabb believed that Grayson's and Thurmond's testimony would hurt the defense.

Perhaps most importantly, and despite a lack of specificity in McNabb's testimony, the record supports his assertion that Thurmond's and Grayson's statements were inconsistent with each other and internally. Thurmond told police upon his arrest that he worked at Perry's Market. Thurmond's landlord and employer told police the same thing. In response to a leading question, McNabb said he was aware of these statements and considered that they conflicted with what Grayson and Thurmond had told him about Thurmond working at the video store. Finally, McNabb stated that he found Grayson not credible. Although McNabb disclaimed any belief that Grayson had outright lied to him, the state court read between the lines and concluded that McNabb believed she was

lying, given his "ethical concerns" in calling her. Thurmond has failed to rebut the state court's finding that McNabb had serious concerns with an alibi defense.

In light of McNabb's reservations, we cannot conclude that the state court was unreasonable in ruling that McNabb's performance fell "within the range of competence demanded of attorneys in criminal cases." *Strickland*, 466 U.S. at 687 (citation and internal quotation marks omitted). Given that Grayson's testimony placed Thurmond in the same part of town as the rape, an alibi defense was weak to begin with. McNabb reasonably concluded that *any* inconsistencies—in particular, those concerning Thurmond's then-employment, which was sure to come up—would destroy the already weak defense and, quite possibly, the reasonable-doubt defense McNabb was building, leaving Thurmond with *no* defense. *See Rompilla v. Beard*, 545 U.S. 374, 381 (2005) ("In judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to counsel's perspective at the time investigative decisions are made, and by giving a heavy measure of deference to counsel's judgments." (internal citations and quotation marks omitted)). In McNabb's view, "many things . . . just didn't add up to Mr. Thurmond's alibi. And it would've been devastating, in my opinion, with this story he was trying to [propose]." Having made this judgment, McNabb reasonably determined that further investigation of an alibi defense would not bear fruit. *Cf. Burger v. Kemp*, 483 U.S. 776, 794–95 (1987) (counsel's limited pretrial investigation into his client's past was reasonable because all the witnesses already brought to his attention provided predominantly harmful information).

This case is unlike those Thurmond cites for the proposition that failing to present available alibi witnesses generally constitutes deficient performance under *Strickland*. *See, e.g.*, *Avery v. Prelesnik*, 548 F.3d 434 (6th Cir. 2008); *Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006); *Clinkscale v. Carter*, 375 F.3d 430 (6th Cir. 2004); *Luna v. Cambra*, 306 F.3d 954 (9th Cir. 2002); *Brown v. Myers*, 137 F.3d 1154 (9th Cir. 1998); *Wilson v. Cowan*, 578 F.2d 166 (6th Cir. 1978). First, we note that the cases of *Clinkscale*, *Brown*, and *Wilson* were not analyzed under AEDPA's heightened standards, and therefore provide little guidance. Moreover, all of the cases relied upon by Thurmond involve either a failure by counsel to contact and personally interview potential alibi witnesses his client identified, or an inability of counsel to explain what trial strategy motivated his decision not to call the witness at trial. Here, however, McNabb did not ignore Grayson. Rather, he personally interviewed her and, based upon his reasoned professional judgment, determined her testimony would likely do more harm than good. The state court reasonably applied *Strickland* regarding counsel's trial strategy.

C.

Finally, Thurmond claims his attorney was ineffective by not objecting to a portion of Detective Baxter's testimony and not seeking to suppress the victim's clothing.

1.

Detective Baxter testified at trial that he created a photographic line-up with pictures of six individuals, including Thurmond. Each individual was shown from the front and the side, for a total of twelve photographs. Before showing the witnesses the photos, Baxter explained generally how

a line-up worked and asked Rivera to translate to the victim, who spoke no English. Rivera did so, and then left the room. Upon viewing the line-up, the victim placed her finger on the photographs of Thurmond, but, according to Baxter, "had a confused look on her face." Baxter then asked Rivera to come back into the room and translate. He told the jury of Rivera's translation: the victim was confused not because she was unsure of her identification, but because she saw twelve pictures instead of six, as she apparently had expected. Once the confusion was cleared up, the victim again identified Thurmond as her attacker.

Detective Baxter's testimony included two levels of hearsay and fit no exceptions. It was therefore inadmissible under Tennessee's evidence rules, and McNabb should have objected to its admission. *See* Tenn. R. Evid. 805. Asserting prejudice from this attorney error, Thurmond contends that "[w]ithout Baxter's testimony, the jury would have only learned that [the victim] was 'confused' when she pointed out Thurmond's picture and would not have heard Baxter's explanation for her confusion," which might have caused it to be "severely troubled" by the victim's initial confusion. This argument, however, ignores the victim's own testimony, which tracked Baxter's and was admissible. Because Baxter's testimony was cumulative to the victim's, the lack of an objection (likely to be sustained) did not prejudice the defense.[3]  *See Wong v. Belmontes*, 130 S. Ct. 383,

---

[3]The state court did not consider the cumulative nature of Baxter's testimony in discerning prejudice. Nevertheless, when AEDPA applies, federal courts consider the *result* or *decision* reached by the state court, not the reasoning employed to get there. *See Holder v. Palmer*, 588 F.3d 328, 341 (6th Cir. 2009); *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) (per curiam) ("[O]ur focus on the 'unreasonable application' test under Section 2254(d) should be on the ultimate legal conclusion that the state court reached and not on whether the state court considered and discussed every angle of the evidence.").

387–88 (2009) (per curiam); *James v. United States*, 217 F. App'x 431, 437 (6th Cir. 2007); *cf.*

*Anthony v. DeWitt*, 295 F.3d 554, 564 (6th Cir. 2002) (finding that because hearsay testimony was

cumulative of other evidence establishing the same fact, admitting it was harmless error under *Brecht*

*v. Abrahamson*, 507 U.S. 619 (1993)).

Moreover, the victim and a co-worker identified Thurmond as the attacker both in and out

of court, another co-worker identified Thurmond in court, an employee of a nearby hotel identified

Thurmond as the individual she saw suspiciously roaming the halls of that hotel the morning of the

rape and weeks earlier, and the license-plate number Rivera identified traced back to Thurmond's

car. The state court reasonably determined that this evidence of guilt belied any claim that

McNabb's failure to object to the hearsay prejudiced Thurmond's defense.

2.

Linda Littlejohn testified that she matched fibers from the victim's clothing to fibers taken

from a shirt in Thurmond's closet. Thurmond contends that counsel was ineffective by not seeking

to suppress the victim's clothing due to a break in its chain of custody. *See, e.g.*, *State v. Cannon*,

254 S.W.3d 287, 297–98 (Tenn. 2008).

After hospital nurses treated the victim, a nurse retained some of the victim's clothing,

including her underwear, for further testing. A preliminary forensic examination at the hospital

revealed the presence of bodily fluids (possibly semen) on the crotch area of the underwear. The

nurse placed the underwear and other clothing in a paper bag and sealed it. She then placed the bag

in a locked cabinet. But when detectives came to retrieve the clothing for further testing, the

victim's underwear was not in the bag, and no one knows what happened to it. Given this break in

the chain of custody, counsel should have moved to suppress *all* the clothing in the bag. Once the

clothing was suppressed, the jury would not have heard Littlejohn's testimony regarding the

matching fibers. However, the state court determined that, in light of the "substantial" evidence of

Thurmond's guilt—the multiple eyewitness identifications and the license-plate match—Thurmond

failed to show a reasonable probability of a different outcome had the fiber evidence been excluded.

We agree and hold that the state court reasonably applied *Strickland*.

IV.

For these reasons, we affirm the judgment of the district court.