**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 13a0820n.06

No. 11-2600

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
*Sep 10, 2013*
DEBORAH S. HUNT, Clerk

UNITED STATES OF AMERICA, )
)
    Plaintiff-Appellant, )
)
v. )
)
                     ) ON APPEAL FROM THE UNITED
RAOGO OUEDRAOGO, ) STATES DISTRICT COURT FOR THE
) WESTERN DISTRICT OF MICHIGAN
    Defendant-Appellee. )

Before: NORRIS, COOK, and MCKEAGUE, Circuit Judges.

COOK, Circuit Judge. Defendant Raogo Ouedraogo was charged, along with co-defendant Rami Saba, with various offenses relating to the September 2007 disappearance of Donald Dietz. After a four-week trial, the jury found Ouedraogo guilty of conspiracy to commit bank fraud, 18 U.S.C. § 1344(2) and § 1349, conspiracy to commit kidnapping, 18 U.S.C. § 1201(c), and kidnapping resulting-in-death, 18 U.S.C. § 1201(a). Nine months later, the district court granted Ouedraogo's Rule 29 motion for judgment of acquittal due to insufficient evidence, reversing all three verdicts and, in the alternative, granting a new trial. The government challenges both decisions. We AFFIRM the court's acquittal judgment on the substantive kidnapping conviction, but REVERSE the acquittal respecting the conspiracy counts, as well as the new-trial grant, and REMAND for sentencing.

I.

A. The Crime

Late in the afternoon on September 11, 2007, Donald Dietz called his bank asking about interest rates. This was the last anyone heard from him. He is presumed dead. The 66-year-old retiree had few friends and no social life, living in Saranac, a secluded area of Michigan neighboring Grand Rapids. Dietz did have, however, nearly $450,000 in retirement savings, most of which he kept in his Lake Michigan Credit Union ("LMCU") account.

A few days after the disappearance, someone impersonating Dietz called LMCU, requesting a complete transfer of his money to a Lebanese bank account. Someone also forged Dietz's signature on two checks, totaling around $12,000.

B. The Suspects: Motive and Opportunity

Ouedraogo and Saba met in the mid-1990s while pursuing doctoral degrees in Belgium. (R. 585, TTR 2107-08, 2149-50.) They remained in touch even after Ouedraogo moved to the United States in 2001. Ouedraogo described Saba as his "closest" friend, explaining that they "shared [their] problems." (*Id*. at 2156, 2170.) Saba's wife, Sarah Saba, confirmed as much, claiming that her husband confided in Ouedraogo more than he did in her. (R. 547, TTR 1059-60.)

At the time Dietz disappeared, Saba lived in Lowell, Michigan, a community neighboring Grand Rapids and Saranac. Though Ouedraogo lived in Philadelphia, he visited Saba four times in 2007, and phone records place him in the Saranac area around the time of the disappearance.

Saba first met Dietz in the summer of 2006 while working as a sales representative for Banker's Life Insurance. During the course of the sales pitch, Saba reviewed Dietz's savings and even went to visit his Saranac home. By late 2006, Saba's financial situation had taken a turn for the worse. Having already lost his job at Banker's Life, he was facing unemployment again for failing to meet his sales quota at New York Life Insurance ("NYL"). Cue Dietz. After leaving Banker's Life and starting with NYL, Saba went to see Dietz twice   in November and December 2006   redoubling his efforts to persuade the retiree to invest.

Authorities began investigating Saba after tracing the LMCU transfer request to a Lebanese bank account controlled by Saba's father. Further investigation revealed that Saba worked with a partner, and Ouedraogo fit the bill   with ties to both Saba and Saranac around the time of Dietz's disappearance.

C.    Trial

Though severed, Ouedraogo's and Saba's trials largely mirrored one another. The government portrayed Dietz as "the perfect mark" (R. 609, TTR at 2842), a recluse with plenty of money but few social connections, who would not be missed. Casting Ouedraogo in a supporting

role, the government argued that he knowingly and voluntarily agreed to help Saba kidnap and kill Dietz in order to steal the retiree's savings. (*Id.* at 2840 ("Rami Saba is the central figure in a scheme to kidnap and kill Donald Dietz and steal his money. What this case is about is the fact that . . . Ouedraogo[] knowingly and voluntarily agreed to help Rami Saba execute that scheme.").) Ouedraogo did not testify at his trial, but the government introduced his pre-recorded conversations with investigators. Briefly, the government's evidence touched on the following themes.

1. Increased Contact Prior to Dietz's Disappearance

Despite Saba and Ouedraogo's close friendship, they visited one another just once between 2002 and 2007. Yet, during the six-month period between March 25 and September 11, 2007, Ouedraogo visited Saba in Grand Rapids four times (March, July, August, and September), and Saba visited Philadelphia at least twice. (R. 542, TTR at 794-96; R. 741, Ex. 187A at 1-2, 4.) Saba used his credit card to pay for two of Ouedraogo's visits, adding hundreds to his $16,000-credit card debt. (R. 542, TTR at 822-824; R. 741-3, Ex. 187C at 1.) Ouedraogo did not mention either the July or August trips during the interviews with police regarding Dietz's disappearance; he likewise kept Sarah Saba in the dark about his September visit. (R. 547, TTR at 1098.) This secrecy, the government offered, reveals Ouedraogo's dissembling.

In addition to in-person visits, Saba and Ouedraogo's phone communication spiked in 2007. Whereas in 2006, they exchanged just 350 calls (R. 735-2, Ex. QQQ at 1), in 2007 they phoned each other 793 times (R. 735-4, Ex. SSS at 1). In January 2007 alone   when the alleged conspiracy

began    they spoke by phone 88 times (*id.*), more than doubling their 35 calls the previous January (735-3, Ex. RRR at 1).  During the September when Dietz disappeared, records show 179 calls, totaling 791 minutes.  (*Id.*)

2.  Pepper Spray/Stun Gun

In July of 2007, Saba purchased two cans of 18% pepper spray online from a Texas company. The seller's description of the product as causing "sensational burning on the face" capable of "drop[ping an individual] to the ground," aligns with its use as a weapon of incapacitation.  (R. 542, TTR at 912, 922-23, 929-30.)  Phone and purchase records reveal that shortly before making the purchase, Ouedraogo and Saba spoke on the phone. During the conversation, Saba accessed the website of Aaron Imports, an Ohio-based vendor specializing in self-defense products, including pepper spray and stun guns.  (R. 542, TTR at 861-62; R. 735-3, Ex. RRR at 14 (calling Ouedraogo on July 16, 2007, at 3:46 p.m. for 31 minutes); R. 740-3, Ex. 156C at 1 (accessing Aaron Imports's website on July 16 at 4:09 p.m.).)  Minutes after ending the call with Ouedraogo, Saba tried unsuccessfully to call Aaron Imports using a calling card.  (R. 738-4, Ex. 137A at 1 (calling "937" number at 4:25 p.m., and 4:26 p.m.); R. 542, TTR at 863-64 (owner of Aaron Imports, giving same "937" number for the business, identifying the calls on Exhibit 137A).)

A few days after Saba's pepper-spray purchase, Ouedraogo traveled to Grand Rapids, and the two men made a trip to Moraine, Ohio    the location of Aaron Imports, according to the store's website.  The government argued this was a third attempt to obtain a stun gun from the store,

pointing to Saba's credit card, computer, and phone records. Saba's credit card reflects gas purchases in southeastern Michigan and northeastern Ohio, along a route to Moraine. His computer records show that Saba accessed Aaron Imports's website before leaving for Ohio, consistent with looking up the store's address. (R. 740-3, Ex. 156C at 1 (visiting Aaron's website twice on July 25th).) Ouedraogo's phone records show several missed calls from his wife. Soon thereafter, Saba's home phone called Saba's cell, prompting another call from Saba's phone to Ouedraogo's home line. Ouedraogo's wife testified that Ouedraogo called her from Saba's phone that night. (R. 609, TTR at 2871.) This suggests that Ouedraogo left his phone at Saba's home during the Ohio trip and used Saba's cell phone to return his wife's calls. They were unable to procure the pepper spray and stun gun during that trip, the government explained, because Aaron Imports relocated in May or June of 2007 and failed to update its web address. (R. 542, TTR at 867.) Upon returning home, Saba again accessed Aaron's website, ostensibly to check the store's (still outdated) address. (R. 740-3, Ex. 156C at 1.)

Barely two weeks after the July trip, Ouedraogo traveled again to Grand Rapids on a ticket Saba purchased. (R. 542, TTR at 810, 823-24.) Again, Ouedraogo never mentioned this Grand Rapids trip in his later statements to investigators. And he stayed at a motel, though he had stayed at Saba's house during previous trips   suggesting an attempt to conceal the visit from his friend's wife.

The day after Ouedraogo returned to Philadelphia, Saba purchased a stun gun online. (R. 542, TTR 932, 936-37; R. 739-2, Ex. 146 at 1-3.) When questioned later, the store owner described this stun gun as one of the most powerful on the market, capable of leaving a person "fatigued and weak." (R. 542, TTR at 942-944.)

Because stun guns are illegal in Michigan, Saba directed shipping to his friend Kwok-Peng Ng, an Ohio resident. (R. 739-2, Ex. 146 at 1.) Though initially reluctant, Ng agreed to forward the gun when Saba claimed a break-in prompted his need for the stun gun to "protect his family." (R. 542, TTR at 950.) But Sarah Saba contradicted the story at trial, denying the alleged burglary and answering "no" when asked "Do you feel [you] need[ed] to have protection [in] your [Lowell] home?" (R. 547, TTR at 1073-74.) Ng forwarded the stun gun in late August. Ng's contact information appeared on Ouedraogo's computer and had been accessed a little over a month before Saba's stun gun purchase. (R. 741, Ex. 157A at 1-2.)

3. Ouedraogo Travels to Grand Rapids in September/Dietz Disappears

Ouedraogo again made another secretive trip to Grand Rapids, arriving just before noon on Tuesday, September 11 and departing just after 5 p.m on Thursday the 13th. (R. 542, TTR at 794-96.) At trial, the government argued that Ouedraogo and Saba carried out the kidnapping during this final trip. First, however, it had to show Dietz actually disappeared during this time. To that end, the government cited Dietz's telephone records and accrued mail. Records confirmed that Dietz placed his last call on September 11 (R. 742, Ex. 207 at 14), calling his banker to ask about interest

rates (R. 542, TTR at 833-35). The banker readily identified the caller as Dietz by his characteristic stutter. (*Id*. at 833) Phone records show Dietz made no other calls on the 11th, and missed all incoming calls starting September 12. (R. 742, Ex. 207 at 14-15.) Next, although Dietz did not receive mail every day (R. 507, TTR at 549-50), a neighbor testified that he checked his mail nearly every day (R. 504, TTR at 345, 355). Yet Dietz's mailbox overflowed with uncollected mail by the time his brothers reported him missing on September 25. (*Id.* at 292, 355; R. 553, TTR at 1590.) The oldest piece of mail in the bunch was postmarked September 12, suggesting the letters began accumulating around September 15. (R. 596, TTR at 2698-99.) Dietz also missed a September 15 family reunion, after missing several calls from his brothers regarding the get-together. (R. 504, TTR 281-82.)

To show that the defendants actually planned to carry out the kidnapping during this time frame, the government pointed to several odd occurrences. First, while driving to Ouedraogo's hotel on September 12th, Saba lied to a police officer who pulled him over for illegally removing his car's license plate from the bumper. (R. 542, TTR at 841-42.) When the officer asked for Saba's insurance information (*id*. at 845), which he kept in the glove compartment (R. 547, TTR at 1102), Saba claimed to be uninsured and that the glove compartment was locked (R. 542, TTR at 844-49). Saba's wife later testified that their car was always insured. (R. 547, TTR at 1102.) Saba, inexplicably, preferred to pay a ticket than open his glove compartment. Based on this evidence, the government argued that Saba: 1) hid his license plate to avoid identification, and 2) lied to avoid opening the glove compartment, where he likely stashed the stun gun and pepper spray.

After spending the night of September 11 in a Motel 6, Ouedraogo checked out the very next day without explanation. Saba called Ouedraogo around 6:30 a.m. on the 12th, and again at 9:40 a.m., right after his license-plate-related encounter with the police. Soon after this call, Saba arrived at the motel and, according to Ouedraogo, the two drove around looking for new lodging and talking about Ouedraogo's marital problems    the reason for his trip, according to the story he gave investigators. He checked into the Days Inn around 2 p.m, leaving several hours unaccounted for. (R. 739-4, Ex. 150 at 1-3.) Ouedraogo tried to fill in the gaps by claiming that he and Saba got lost on the way to the second hotel    which was located just four miles from the Motel 6. (R. 585, TTR at 2240-41.)

On the last day of the trip, September 13th, around 9:30 a.m., Saba called Ouedraogo, the call pinging a cell tower near the Days Inn. Ouedraogo checked out around 11:30 a.m., after Saba came to pick him up. (R. 739-4, Ex. 150 at 4.) The two men began driving, which Ouedraogo again attributed to wanting to discuss his marital problems. Saba received a call from his wife while in Saranac at 12:16 p.m. Within 36 minutes, Saba's phone pinged off a cell tower near his home. (R. 579, TTR at 1895-96.) Saba's wife testified that she called him and asked that he return home in order to arrange medical care for their sick newborn. Ouedraogo claimed Saba drove him back to the Days Inn, but the government argued this was implausible because 1) Ouedraogo had already checked out of the hotel, and 2) the hotel was too far from Saranac for the story to make sense. (R. 585, TTR at 2241-42.) The government tied together this evidence as follows: Saba picked up Ouedraogo at his hotel and the two men traveled to Saranac, where they kidnapped and killed Dietz.

After the unexpected call from Saba's wife, Saba rushed home, leaving Ouedraogo alone in Dietz's home. Ouedraogo called Saba at 2:42 p.m. that afternoon (R. 737-1, Ex. 134B at 2), and again at 10:10 p.m. that night (*id.*) after returning to Philadelphia (R. 542, TTR at 794-96).

### 4. SIM Phone ("719 number") and Tracfone Use

At some point during the September trip, Saba gave Ouedraogo the SIM (Subscriber Identity Module) card for Saba's third line, 616-719-9666 ("SIM phone" or "719 number") (R. 585, TTR at 2227-29), a line Sarah Saba knew nothing about (R. 547, TTR at 1125). Ouedraogo used the SIM card to communicate with Saba 54 times between September 15 and 28, around the time Saba was trying to transfer Dietz's LMCU funds. (R. 735-3, Ex. RRR at 20-21) Calls placed using this card would register as coming from Saba's account, permitting the two men to call each other while making it seem like Saba's two lines were calling one another. At trial, the government argued that the purpose of the SIM card exchange was to conceal conspiracy-related communications between the two men.

The government also introduced evidence suggesting that Saba tried to cover his call-history using a tracfone — a prepaid cell phone that does not require the purchaser to provide any identifying information. (R. 553, TTR at 1536-37.) Saba purchased the device on September 18, turned it on the following day and, within minutes, called Ouedraogo's SIM phone. (*Id*. at 1541; R. 736-3, Ex. 121 at 1.) Evidence linking Saba to the tracfone included the circumstances surrounding its purchase at a Staples store in Grand Rapids (R. 553, TTR at 1555-56), two minutes before Saba's cell phone

pinged off a tower near the store (R. 736-3, Ex. 121 at 1). Further, the tracfone and Saba's personal phone pinged off the same towers, suggesting that they were in the same coverage area. (*See* R. 736-3, Ex. 121 at 1-4 (calls using tracfone use Bowes Rd, Lowell tower to field calls from Saba).)

From September 19th to the 30th, Saba used the tracfone 34 times. Calls using this phone, the government offered, related to the bank fraud conspiracy. They included calls to LMCU (to transfer Dietz's money), various utility companies (to close Dietz's service accounts), and Ouedraogo (to keep the co-conspirator informed of the plan's progress). The tracfone calls, which the government argued implicated Saba in both the fraud and kidnapping charges, usually followed or preceded Saba's calls to Ouedraogo's SIM phone. The LMCU calls, for example, occurred within minutes of calls to Ouedraogo. (R. 736-3, Ex. 121 at 1-3.)

5. Bounced Checks

The government's evidence also showed that Saba forged and attempted to deposit two checks drawn on Dietz's account soon after Ouedraogo's September trip to Grand Rapids: September 17, and October 1. (R. 507, TTR at 533-34, 537-38 (reviewing evidence).) On October 2, Saba's bank called to inform him that they placed a hold on the two checks. (R. 745-3, Ex. 135 at 4 (call at 3:36 p.m.).) Saba called Ouedraogo's cell approximately half an hour later, but Ouedraogo did not answer. Though Saba missed Ouedraogo's return call a minute later, they spoke for four minutes an hour later. The government argues that the short time between the Ouedraogo and bank calls signals that Saba and Ouedraogo were partners in the fraud scheme. (R. 609, TTR

at 2887.) Also, Franklin Ash, Saba's fellow inmate, testified that Saba told him about a call he placed to his "partner," because "he was worried he was going to get caught because of the check bouncing." (R. 586, TTR at 2311.)

6. Lake Michigan Credit Union (LMCU)

On September 19, in relatively short succession, Saba made two calls to Ouedraogo's SIM phone and one to LMCU, followed later that day by a call to his father in Lebanon. (R. 736-3, Ex. 121 at 1.) The next day, someone impersonating Dietz sent a type-written letter to LMCU, directing the bank to close his account and transfer the $443,606 balance to an account at Blom Bank in Lebanon — Saba's father's account. (R. 542, TTR at 764-65, 770; R. 740-2, Ex.155A.) The letter was a fake; someone had forged Dietz's signature. Forensic analysis of Saba's computer revealed fragments of the letter and a file related to the letter's envelope. Less than seven minutes after creating the envelope file, Saba had a six-minute phone conversation with Ouedraogo. (R. 740-4, Ex. 156G at 1; R. 736-3, Ex. 121 at 1.) They called each other four more times that day. (R. 736-3, Ex. 121 at 1.) On September 21, someone using the tracfone called LMCU to confirm the transfer order. (R. 542, TTR at 773-75.) The employee who took the call described the voice as male with a Middle Eastern accent. (R. 542, TTR at 778.) Suspicious, the employee requested a handwritten, notarized letter from the caller, who became "irritated" at the request. (R. 542, TTR at 783.) This employee notified a second LMCU employee, explaining that she was "uncomfortable" with the typewritten letter's request. (R. 525, TTR at 684.)

On September 24, Saba made another tracfone call to LMCU seeking to empty the account. (R. 525, TTR at 686-88; R. 736-3, Ex. 121 at 1 (cell tower nearest Saba's home).) The second LMCU employee also identified the caller as male, with a heavy Middle Eastern accent. (R. 525, TTR at 687.) That employee echoed the first employee's directions that the caller Saba needed to fax a handwritten, notarized letter before the bank would honor the request. (R. 525, TTR at 688-89.) Within two minutes of that call, Saba used his cell phone to call Ouedraogo's SIM phone. (R. 736-3, Ex. 121 at 1.)

7. Ouedraogo's September 26 Trip to Brooklyn/Saba's "Notarized" Letter

Two days after the LMCU call, Ouedraogo drove from Philadelphia to Brooklyn, New York, exchanging 13 phone calls with Saba along the way. (R. 737-1, Ex. 134B at 10-11.) After arriving in Brooklyn, Ouedraogo talked to Saba for a total of 47 minutes, using a cell tower near Sharlene Seixas's bookstore. (R. 554, TTR at 1798-99; R. 579, TTR at 1953-57; R. 742-1, Ex. 236 at 1.) Seixas was a notary public, working primarily out of her bookstore. (R. 554, TTR at 1799.)

Forensic analysis of Saba's computer uncovered a copy of a handwritten letter, purportedly written and signed by Dietz, dated October 3, 2007. This letter had a typed signature block and a Brooklyn notary's signature. (R. 742-2, Ex. 267 at 2.) The notary testified that, though this was her signature, the document's typed signature block and missing notary-seal proved it a fake. (R. 554, TTR at 1802-03.) A computer forensic expert testified that this letter was located in a file consistent with having been scanned into the computer (R. 552, TTR at 1269-70), stitched together from

- 13 -

several individual scans (*id*. at 1277-79). At trial, the government argued that Ouedraogo went to

Brooklyn to secure Seixas's signature for Saba in furtherance of the bank fraud.

### 8. Call to Gene Dietz

On September 30, Saba called Gene Dietz   the victim's brother   using the tracfone, posing

as Donald Dietz, and requested help with making the transfer from LMCU. (R. 553, TTR at 1590-

95.) The caller had a "strange tale," which culminated in the "tracfone Dietz" claiming to be leaving

the country, hence the need to transfer his LMCU funds out of the country. Gene, aware of his

brother's absence and reclusive nature, confronted the caller, accusing him of hurting the real Donald

Dietz. Flustered, the caller hung up suddenly. (*Id*. at 1596-99.) Saba stopped using the tracfone

after that. (R. 736-3, Ex. 121 at 4.)

### 9. Saba's Life Insurance

On October 1, 2007, Saba applied for a five-year term policy valued at $750,000, with an

accidental death benefit of $300,000. He listed Ouedraogo as a 20% beneficiary, the equivalent of

about half of Dietz's savings. (R. 507, TTR at 507-08 (20% of $1,050,000, or about $210,000).)

The government argued this was Saba's way of insuring Ouedraogo's payout, even if the conspiracy

failed.

Just over two weeks later, Saba visited Ouedraogo in Philadelphia, returning the following

day. The government related this trip to Saba's life insurance payment (R. 736-1, Ex. 102 (check

for $472.20 cleared October 12)), arguing that Saba wanted to reassure Ouedraogo that he would get his share, even if the plan fell through.

Four days after Saba's return, police began their surveillance of him. (R. 585, TTR at 2267-68.) That same day, Saba drove headlong into a guard rail on a clear and dry day, circumstances that made the detectives following him consider the act either "intentional" or "very unusual." (R. 554, TTR at 1793-96.)

### 10. Jail Call

Police arrested Saba on December 13, 2007, placing him in Kent County Jail. The first person he called was Ouedraogo. Saba later asked his wife to call Ouedraogo and tell him the details of the arrest (R. 547, TTR at 1114), to warn him, the government surmised.

### 11. Government's Witness Franklin Ash

Saba first met Franklin Ash in March 2009 when they were inmates at Ionia County Jail. At first the two did not get along, and Ash testified he "tormented" Saba because of his connection to Dietz's disappearance. (R. 586, TTR at 2370.) Although Ash did not know Dietz personally, he "kn[ew] him from around town," identifying Dietz as "a quiet guy, very shy, loner, . . . known as the bicycle man." (*Id.* at 2369.) Despite their initial friction, the two became friends after Ash warned Saba not to confide in another inmate rumored to be a "snitch." (*Id*. at 2370-72.) Admitting that he did not have a "high opinion" of "snitches," Ash explained that he testified against Saba to avoid

contempt charges. (*Id*. at 2372-73.) After testifying before the grand jury, Ash had to be moved to a different prison unit because Saba "verbally threatened to kill [Ash] and [his] family." (*Id*. at 2380.)

Ash relayed part of a 15-20 page statement Saba wrote in jail relating to Dietz's disappearance. After Ash advised Saba to flush the statement down the toilet because "it could be used as evidence against him," Saba did so. (*Id*. at 2374.) The statement was not written as a confession; rather, it faulted an unidentified third party for the conspiracy in a manner that implicated Saba. (*Id*. at 2303 ("The letter . . . was written as a third party statement, . . . it's not an I or we did, it was a he and they did . . . .").) The statement included references to a single "partner," a "plan [that] didn't go as planned" (*id*. at 2377), and the use of a taser, pepper spray, and tape to "dispose of a body." (*Id.* at 2376.) Ash stated that Saba told him that after the checks bounced, the "third person" called his friend/partner. (*Id.* at 2377-78.)

D.      Jury Verdict and District Court's Judgment of Acquittal

The government ultimately charged Ouedraogo with conspiracy to commit bank fraud, conspiracy to commit kidnapping, substantive kidnapping resulting in death, and conspiracy to commit interstate murder-for-hire. The jury convicted him of all but the interstate murder-for-hire charge.

Ouedraogo filed a timely motion for judgment of acquittal on all counts or, alternatively, a new trial. Despite its earlier denial of these motions at the close of the government's case, (R. 586, TTR at 2430-33 ("[T]he government's evidence is sufficient to raise an inference that a conspiracy existed, . . . that there was a plan that Mr. Saba was involved with and there is evidence that Mr. Ouedraogo was part of it.")), and nearly nine months after the verdict, the court granted both motions, dismissing the government's case as "nothing more than speculative hypotheses" (R. 705, Op. at 15). Granting the new-trial motion, the court also found that the jury's verdict contradicted the great weight of the evidence, and that Ash's testimony should not have been admitted as a hearsay exception. The government appeals.

II.

A. Acquittal for Insufficient Evidence

This court reviews de novo a district court's acquittal due to insufficient evidence, *United States v. Humphrey*, 279 F.3d 372, 378 (6th Cir. 2002) (citing *United States v. Talley*, 194 F.3d 758, 764 (6th Cir. 1999), evaluating "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This court "draw[s] all available inferences and resolve[s] all issues of credibility in favor of the jury's verdict." *United States v. Salgado*, 250 F.3d 438, 446 (6th Cir. 2001). In this way, we do not weigh evidence or assess witness credibility. *Matthews v. Abramajtys*, 319 F.3d 780, 788 (6th Cir. 2003) ("It is the

province of the factfinder to weigh the probative value of the evidence and resolve any conflicts in testimony.") (citing *Neal v. Morris*, 972 F.2d 675, 679 (6th Cir. 1992)). Substantial and competent circumstantial evidence may support a verdict. *Talley*, 194 F.3d at 765 (citing *United States v. Keeton*, 101 F.3d 48, 52 (6th Cir. 1996). Although the evidence need not eliminate all reasonable hypotheses except that of guilt, we must guard against "piling inference upon inference." *United States v. Sliwo*, 620 F.3d 630, 635, 638 (6th Cir. 2010) (citation omitted).

1. Conspiracy Convictions

To prove a conspiracy, the government had to show: "(1) the existence of an agreement to violate the law; (2) knowledge and intent to join the conspiracy; and (3) an overt act constituting actual participation in the conspiracy." *United States v. Blackwell*, 459 F.3d 739, 760 (6th Cir. 2006). "It is not necessary to prove a formal agreement; 'a tacit or material understanding . . . is sufficient to show a conspiracy.'" *United States v. Jordan*, Nos. 11-6143, 11-6084, 2013 WL 163969, at *7 (6th Cir. 2013) (citing *United States v. Pearce*, 912 F.2d 159, 161 (6th Cir. 1990)). Just as the existence of a conspiracy "may be inferred from circumstantial evidence, a defendant's knowledge of and participation in a conspiracy also may be inferred from his conduct and established by circumstantial evidence." *United States v. Conatser*, 514 F.3d 508, 518 (6th Cir. 2008). This participation "need only be slight." *Id.* (citing *United States v. Avery*, 128 F.3d 966, 971 (6th Cir. 1997)).

The government interlaced the kidnapping and bank fraud conspiracies, theorizing that kidnapping Dietz was one way to ensure that (1) the defendants could get away with the fraud and (2) obtain the necessary identification information to effectuate the fraudulent money transfers.

### a. Bank Fraud Conspiracy, 18 U.S.C. §§ 1344(2) and 1349

With the bank fraud conspiracy charges, the underlying violation entails: (1) the defendant knowingly executed or attempted to execute a scheme to defraud a financial institution (2) insured by the FDIC, (3) with the intent to defraud. *See United States v. Munar*, 419 F. App'x 600, 604-05 (6th Cir. 2011) (citing *United States v. Everett*, 270 F.3d 986, 989 (6th Cir. 2001)). Ample evidence showed that Ouedraogo and Saba conspired to steal Dietz's LCMU funds.

The sheer volume of phone calls between the defendants in 2007 suggests a shift in their relationship, consistent with a burgeoning conspiracy. The number of calls between them doubled, and they traveled to meet at least six times, with Ouedraogo's visits corresponding to key moments of the conspiracy. Belying Ouedraogo's claim that this communication was nothing more than business as usual, after attempts to steal Dietz's money failed, the frequency of phone calls reduced significantly (R. 735-4, Ex. SSS at 1) (showing 179 calls in September but only 15 in November)).

Casting a shadow of suspicion over these interactions, the government points to defendants' "concerted efforts to keep secret a number of their activities." One such effort involves Saba's tracfone purchase, which thwarted tracking of conspiracy-related phone calls. Ouedraogo covered

his tracks by using Saba's SIM card, obscuring Ouedraogo's identity by linking those calls to Saba's account. These SIM calls usually preceded or followed key tracfone calls including calls to LMCU, utility companies, and the victim's brother consistent with Saba updating Ouedraogo on the plan's progress. Ouedraogo stopped using the SIM phone after Saba's December 13, 2007 arrest. (*See* R. 735-3, Ex. RRR at 19-20 (defendants call each other three times prior to tracfone purchase; 16 minutes after purchase, and after tracfone activated); R. 736-3, Ex. 121 at 1 (Saba calls LMCU and then, two minutes later, calls Ouedraogo); R. 737-3, Ex. 135A, 719-Call Records at 1-4 (last 719-call day occurs day before Saba's arrest); R. 671, Gov. Resp. Rule 29 Mot. at 16-18 (summarizing mirroring of calls with tracfone and communication with Ouedraogo).)

More importantly, the evidence connects Ouedraogo to each of Saba's steps in furthering the bank fraud conspiracy. Though it was Saba who placed tracfone calls to LMCU, the utility companies, and Dietz's brother, calls to Ouedraogo followed in quick succession. Yes, it was Saba who ordered the pepper spray and stun gun, but he did so shortly after several calls to Ouedraogo. Ouedraogo also had the contact information for Ng in his computer, and we know from the record that Saba shipped the stun gun to Ng's address in a different state because shipping directly to Michigan was out of the question. The evidence also suggests that, soon after LMCU employees told Saba he needed to send a handwritten, notarized request for the account transfer, Ouedraogo made a trip to Brooklyn to obtain the notary's signature. During this trip, Ouedraogo's phone calls placed him in the immediate vicinity of the notary whose forged signature appears in Saba's computer, corresponding to the second transfer-request letter to LMCU. The record also tells us that,

soon after the conspiracy began to unravel (Gene Dietz all but accused the Dietz-impersonator on the phone of being a murderer), Saba took out another life insurance policy listing Ouedraogo as a 20% beneficiary. The policy, at once unnecessary and beyond his budget, logically supports the government's interpretation: that it was Saba's way of guaranteeing Ouedraogo's share of the fraud's spoils.

Saba's eagerness to talk to Ouedraogo following arrest, too, suggests a coordinated effort. Not only was Ouedraogo the very first person Saba called from jail, but Saba also arranged for Sarah Saba to bring Ouedraogo up to speed on the circumstances of his arrest. These are important links that the district court and Ouedraogo discount or diminish, misconstruing the government's case as myopically centered on Saba.

Ouedraogo dismisses this evidence, arguing that: (1) the calls reflect bad timing rather than malicious intent; (2) Saba gave Ouedraogo his SIM card, not to hide their communications but to help Ouedraogo reduce his phone bill;[1] (3) it was coincidence that Ouedraogo visited Saba during the time Dietz disappeared; and (4) he and Saba got lost for several hours looking for his second hotel, located four miles down the road from his first one. This view of the evidence overlooks Ouedraogo's obfuscating answers to investigators' questions   failing to mention two of his visits

---

[1]But Ouedraogo's phone bill actually *increased* after acquiring the SIM card. (*Compare* R. 735-1, Ex. H at 1 (July/August Coverage Charges , pre-SIM phone, $90.22), *with* R.738-1, Ex. 136B at 1 (August/September Coverage, post-SIM phone, $161.43) *and* R. 738-2, Ex. 136C (October Coverage, $103.17).)

to Grand Rapids and the July trip to Ohio, and denying venturing into Saranac even though cell tower data proved otherwise. Though possible, the defense's theory of the case was not plausible, and a jury could reasonably reject it.

From this evidence, the government argues that "[s]ecrecy and concealment are essential features of successful conspiracy . . . [and therefore] the law rightly gives room for allowing the conviction of those discovered upon showing sufficiently the essential nature of the plan and their connections with it." *Blumenthal v. United States*, 332 U.S. 539, 557 (1947); *see also Sliwo*, 620 F.3d at 641-42 (Katz, J., dissenting). We add that "it is enough that the government present evidence that, if believed, proved that the defendant knew of the conspiracy's general scope and sought its common end." *United States v. Little*, 173 F.3d 857 (6th Cir. 1999) (table) (quotation and alteration omitted). On this record, a rational factfinder could conclude that Ouedraogo knowingly joined the bank fraud conspiracy. *See United States v. Warshak*, 631 F.3d 266, 310 (6th Cir. 2010) (finding sufficient evidence based on defendant's presence at meetings where conspiracy discussions took place, and trust-relationship with one of the conspirators).

The jury reasonably relied on this evidence to find Ouedraogo guilty of conspiracy. It weighed the evidence and assessed the government's theory, concluding as Saba's jury concluded that the evidence pointed to a two-person conspiracy, the illegal object of which was to steal $450,000 from a reclusive retiree's savings account.

b. Conspiracy to Commit Kidnapping, 18 U.S.C. § 1201(c)

The second conspiracy charge includes the following elements: (1) the defendant knowingly and willfully kidnapped, abducted, seized, or confined another person; (2) for ransom, reward, or other benefit; and (3) traveled in interstate commerce or willfully used an instrumentality of commerce. *United States v. Brika*, 487 F.3d 450, 456 (6th Cir. 2007); *see also United States v. Dixon*, 592 F.2d 329, 340 (6th Cir. 1979)). The government's evidence supported this charge as well.

As with the fraud conspiracy, the government's case encompassed a host of well-timed phone calls, and other closely coordinated acts, that reflected a common plan or scheme. Ouedraogo downplays the importance of these phone calls in particular those immediately preceding or following Saba's communication with the LMCU, utility providers, and Gene Dietz arguing that the government should have provided evidence of the content of these calls. We regularly rely on cell phone records as part of a criminal case, even in the absence of of the conversation's content. *United States v. Spires*, No. 12-3229/3230, 2013 WL 468827, at *1 (6th Cir. Feb. 8, 2013) (upholding a drug-distribution charge where the "frequent calls to and by [defendant] occurred immediately before several drug transactions completed by his coconspirators"); *United States v. Dhaliwal*, 464 F. App'x 498, 512 (6th Cir. 2012) (affirming conspiracy conviction where defendant and alleged coconspirator exchanged phone calls immediately before key conspiratorial events).

The timing of these calls connects Ouedraogo to Saba's purchase of two cans of pepper spray. In the week preceding Saba's pepper-spray purchase, Ouedraogo went to Grand Rapids and the two traveled to Ohio. The Ohio trip took less than a day, suggesting a specific design. Suspiciously, the trip began and ended with Saba using his computer to access the Moraine, Ohio address for Aaron Imports, the *same* self-defense supply store Saba attempted to contact before ordering the pepper spray. Given the failed attempt to locate Aaron's physical location, Saba later placed an online order for a stun gun, scheduling delivery to an Ohio address, as evidenced on Ouedraogo's computer.

After linking Ouedraogo to the stun gun and pepper spray, the government presented the merchant's testimony regarding the products' incapacitating capabilities. (R. 542, TTR at 942-944 (testifying that the gun could leave a person feeling "fatigued and weak"); *id.* at 912-13 (listing effects of pepper spray, including "sensational burning" and limiting all but "life support breathing").) In conspiracy cases, where direct evidence of intent is scarce, this court may look to circumstantial evidence in order to draw conclusions about intent. *See, e.g.*, *United States v. Pelfrey*, 822 F.2d 628, 632 (6th Cir. 1987) (reasoning that "where the offense charged is so inherently secretive in nature as to permit marshalling of only circumstantial evidence," this kind of "inferential proof may be controlling"); *United States v. Christian*, 786 F.2d 203, 211 (6th Cir. 1986) ("A [conspiracy] defendant's guilty knowledge . . . may be inferred from surrounding circumstances."). Ouedraogo's connection to Saba's acquisition of two weapons of incapacitation supplies this circumstantial evidence.

The evidence further implicated Ouedraogo both before and during the two-day period when Dietz disappeared. Not only was Ouedraogo in the right place at the right time and with the right person but he actively sought to conceal his presence in Grand Rapids from Saba's wife (R. 585, TTR at 2188-89, 2192), despite a compelling reason to visit the Saba home: the recent birth of Saba's daughter, Ouedraogo's goddaughter. Likewise, Ouedraogo told authorities he and Saba never ventured into Saranac during this trip, yet telephone records show Saba made a phone call from a cell tower in Saranac during a time Ouedraogo claimed to be with Saba (*id*. at 2167-69). This was also when Saba gave Ouedraogo the SIM card (*id*. at 2227), supporting the government's inference that the two men tried to thwart any tracking of their communication.

With this evidence in mind clandestine visit to Grand Rapids and Saranac, dereliction of godfather duties, and unverified account of his whereabouts for most of the September trip the jury could reasonably conclude that Ouedraogo formed part of a conspiracy to kidnap and defraud Dietz. *See Salgado*, 250 F.3d at 447 (concluding jury could infer knowledge and intent about drug conspiracy from defendant's evasive statements to authorities and suspicious circumstances surrounding trip to key conspiratorial location).

Today's decision aligns with this circuit's previous sufficiency-of-the-evidence holdings. Recently, in *Davis v. Lafler*, the en banc court affirmed the district court's denial of habeas, finding sufficient evidence to support the defendant's conviction for aiding and abetting a carjacking. 658 F.3d 525, 534 (6th Cir. 2011) (observing "a defendant who challenges the sufficiency of the evidence

to sustain his conviction faces a nearly insurmountable hurdle") (quotation marks and brackets omitted). In that case, the prosecution alleged Davis acted as a lookout while his friend stole a car from a restaurant parking lot. Sustaining the conviction, the court emphasized that Davis arrived at the scene with the carjacker, lingered in the restaurant without ordering any food, and stood at the window as if waiting for a crime to unfold. Because "Davis would have no had no other way of so closely coordinating his actions with those of [the carjacker] if he had not been actively watching what was taking place," the evidence supported his guilt. *Davis*, 658 F.3d at 532. Though nothing in the record specifically tied Davis to the underlying crime, his actions preceding the carjacking, as well as "the lack of any proof to refute the circumstantial evidence that Davis and [the carjacker] were previously acquainted," *id.* at 533, supplied sufficient evidence to convict. The same may be said for the kidnapping and bank fraud schemes in the present case.

### 2. Substantive Kidnapping Resulting-in-Death

The government's evidence, though sufficient to show a plan and actions in furtherance, stops short of proving that Ouedraogo actually carried out that plan. Unlike a conspiracy charge, which requires an overt act and intent to commit the underlying offense, the substantive kidnapping count required evidence that Ouedraogo: (1) knowingly and willfully kidnapped, abducted, seized, or confined Dietz; (2) held him for ransom, reward, or other benefit; and (3) traveled in interstate commerce or willfully used an instrumentality of commerce. *Brika*, 487 F.3d at 456; *see also Dixon*, 592 F.2d at 340. Not only this, but the government also had to prove that the kidnapping

either directly or proximately caused Dietz's death. 18 U.S.C. § 1201(a); *see United States v. Montgomery*, 635 F.3d 1074, 1087 (8th Cir. 2011) ("[T]he statute requires 'only that the death of any person results' in the course of the kidnapping.") (citations omitted); *United States v. Taylor*, No. 1:04-CR-160, 2006 WL 3489043, at \*3 (E.D. Tenn. Dec. 4, 2006).

The government stitched together the following facts to demonstrate kidnapping resulting-in-death: (1) Ouedraogo and Saba conspired to kidnap Dietz, a reasonable conclusion based on circumstantial evidence of Ouedraogo's repeated communications and close cooperation with Saba; (2) the evidence shows that Dietz disappeared between September 11 and 13, at a time when Ouedraogo was visiting Saba in the Grand Rapids area; (3) the parties agree that Dietz is dead; and (4) Franklin Ash related Saba's statements involving a "partner" and a botched plan involving a stun gun, pepper spray, tape, and a van used to dispose of a body. Though backing each of the proposed inferences, the evidence falls short of the ultimate conclusion: that the defendants did more than plot, they carried out their scheme and killed Dietz in the process.

Even Ash's testimony, arguably the most probative evidence of Dietz's death in connection with a kidnapping, falls short of sustaining the government's charges against Ouedraogo. Plotting and carrying out a scheme such as kidnapping are two separate matters, as the government's proofs illustrate. The government's points add up to a reasonable inference that Ouedraogo was the partner involved in the conspiracy to kidnap Dietz. Conspicuously absent, however, is any evidence that

Ouedraogo participated in the actual kidnapping and, more so, that the kidnapping *proximately caused* Dietz's death.

As the district court correctly observed, this case remains without a body, without a crime scene, or physical evidence of a homicide. The proofs do not tell us that there was an actual kidnapping, when and where it occurred, how long defendants may have held Dietz before he died, or how he died. Even now, the government still fails to present a complete or mostly complete account of when or how Dietz died. As we noted in *Newman v. Metrish*, "where the evidence taken in the light most favorable to the prosecution creates only a reasonable speculation that a defendant was present at the crime," the charges cannot survive a sufficiency challenge. 543 F.3d 793, 797 (6th Cir. 2008). In this case, not only must we speculate as to Ouedraogo's presence at the scene of Dietz's death, but we must draw up this scene from scratch, the evidence providing a blank slate. We must, therefore, agree with the district court's assessment and affirm its acquittal on the substantive kidnapping resulting-in-death count.

B.      New Trial

Having considered the evidence sufficient to support the jury's verdict on the conspiracy charges, we now turn to the district court's alternative form of relief: the new trial order.[2] Reviewing

---

[2] Because we agree that the government's evidence on the substantive kidnapping count fell short a merits-based, rather than procedural conclusion the appropriate remedy is acquittal, not retrial. *See Burks v. United States*, 437 U.S. 1, 18 (1978).

this judgment for "clear and manifest abuse of discretion," *United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007), we reverse only upon a "definite and firm conviction that the trial court committed a clear error of judgment," such as "rel[ying] on clearly erroneous findings of fact, or . . . improperly appl[ying] the law[.]" *Tompkin v. Philip Morris USA, Inc.*, 362 F.3d 882, 891 (6th Cir. 2004). To the extent that the new-trial order hinges on the court's post-trial exclusion of Ash's testimony, we evaluate this determination for abuse-of-discretion as well, *United States v. Price*, 134 F.3d 340, 348 (6th Cir. 1998), conducting a harmless error analysis over the challenged proofs, *United States v. Trujillo*, 376 F.3d 593, 611 (6th Cir. 2004).

A district court may order a new trial "in the extraordinary circumstances where the evidence preponderates heavily against the verdict." *Hughes*, 505 F.3d at 593. In making its assessment, the trial court may evaluate the "credibility of the witnesses and the weight of the evidence" to protect against a "miscarriage of justice." *United States v. Lutz*, 154 F.3d 581, 589 (6th Cir. 1998). Granting Ouedraogo's motion for a new trial, the district court observed: (1) the jury's verdict was against the manifest weight of the evidence, and (2) Ash's testimony relating to Saba's "quasi-confession" should not have been admitted. (R. 705, Op. at 27-28.) The government appeals this decision and, were we to affirm the new-trial order, it asks for reassignment to a new judge.

The district court evidently took the position    repeating its reasons for granting Ouedraogo's Rule 29 motion    that the government's proofs required unreasonable inferences, inadequately supported by the record. This rationale, however, overlooks, or improperly discounts, much of the

evidence discussed above. Taking advantage of its freedom to assess witness credibility, the court framed Ash's testimony as "totally incredulous," and concluded that, without it, the government lacked any evidence connecting Ouedraogo to Saba's illegal actions. The government replies that this constitutes a clear error of fact. We agree. As our review of the evidence demonstrates, the government presented sufficient circumstantial links between Ouedraogo and the fraud and kidnapping conspiracies, even without Ash's testimony.

We turn, then, to the court's second reason for granting a new trial. Federal Rule of Evidence 804(b)(3) provides an exception to the hearsay bar when a declarant (here, Saba) provides self-incriminating statements that are "supported by corroborating circumstances," indicating their trustworthiness. Thus, as the court correctly pointed out, to admit Ash's testimony under Rule 804(b)(3), Saba's statements had to be (1) against his penal interest, and (2) trustworthy, i.e., corroborated in some way. (R. 705, Op. at 29-30.)

Initially admitting Ash's testimony, the trial court observed that the evidence established "a sufficient[ly] close relationship between [Ash and Saba] to support the reliability, the believability, the corroboration of the testimony that [Saba] told [Ash] that there was a plan, that it went too far, . . . and that he had a partner." (R. 586, TTR at 2361.) Likewise, it found that Ash's testimony was "clearly against Mr. Saba's penal interest, particularly with regard to the conspiracy charges." (*Id*.) After the verdict, the court reversed course, concluding that the testimony "was designed to meet [Ash's] own purposes . . . to complete his obligation to testify with minimal commitment and

repercussions" and that "[i]t is unlikely that any bond ever existed between Ash and Saba." (R. 705, Op. at 32-33.)

In response, the government points out, "the credibility of the witness who relates the [hearsay] statement is not a proper factor for the court to consider in assessing corroborating circumstances." Fed. R. Evid. 804(b)(3) advisory committee note. Applying *United States v. Johnson*, 581 F.3d 320, 327 (6th Cir. 2009), the government asserts that: (1) the "closeness of the relationship between [Saba] and [Ash]"; (2) the "truly self-inculpatory" nature of the statements; and (3) the lack of personal gain from testifying, all support admission. To be sure, the government did provide some evidence suggesting Ash and Saba's relationship shifted from enemies to "confidants" after Ash warned Saba about jailhouse "snitches." (R. 586, TTR at 2371-72.) This background, however, cannot overcome the residual doubts surrounding Ash's statements, which, the witness himself admitted, could have been influenced by other case materials, and ultimately lacked external support. In particular, Ash admitted that he knew of Donald Dietz and was a little upset about being assigned to the same cell as the man charged with his disappearance. Ash took an interest in the case and followed the accounts of the investigation in the local newspaper. He also had access to and reviewed the indictment against Saba. He acknowledged that he read about the case in other sources, in addition to Saba's (allegedly destroyed) third-party confession.

Finding no abuse of discretion in this evidence ban, we now turn to the government's harmlessness argument. An error is harmless unless it is "more probable than not that the error

materially affected the verdict." *United States v. Hernandez*, 227 F.3d 686, 696 (6th Cir. 2000).

Ash's testimony was strictly limited to two subjects: the existence of a "plan" and Saba's call to a

"partner" after the two Dietz checks bounced. This testimony, which merely tied together the

documentary evidence the government presented at trial, was also subjected to thorough cross-

examination. (R. 586, TTR at 2380-90 (cross-examination), 2395-99 (further cross-examination);

2401-02 (further recross-examination).) *Cf. Hernandez*, 227 F.3d at 696 (citing both the fact that

the witness "introduced essentially nothing new to the case" and was "extensively cross-examined"

as supporting conclusion that evidentiary error was harmless). Moreover, Ash's statements did not

directly implicate Ouedraogo    though they did reinforce the conspiracy and partnership aspects of

the case    so it is unlikely that the jury's guilty verdict materially rested on his testimony. In light

of the substantial evidence establishing a connection between Ouedraogo and the bank fraud and

kidnapping schemes, Ash's testimony did not "materially affect[] the verdict." *Id.* Concluding that

the district court abused its discretion in granting the alternative relief of a new trial, we reinstate the

jury verdict on the conspiracy counts. Accordingly, we also deny the government's reassignment

request as moot.

## III.

We AFFIRM the acquittal on the substantive kidnapping resulting-in-death count, but

REVERSE the district court's acquittal and new-trial grant on both conspiracy counts. We

REMAND for reinstatement of those convictions and sentencing.

**ALAN E. NORRIS, Circuit Judge, dissenting in part and concurring in part.** As the district court recognized, the standard that a criminal defendant must meet in order to prevail on a post-trial motion for a judgment of acquittal is onerous. "If *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," we must affirm the judgment of the jury. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[W]e do not weigh the evidence, consider the credibility of witnesses or substitute our judgment for that of the jury." *United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993).

The majority does a thorough job in mustering the evidence that it believes supports the reinstatement of the conspiracy counts. I do not take issue with any of the facts presented by the majority. I simply disagree that they add up to the quantum of evidence required to support a finding of guilt beyond a reasonable doubt.

First, the case against Mr. Ouedraogo is completely circumstantial. Of course, circumstantial evidence standing alone can sustain a guilty verdict. *United States v. Parkes*, 668 F.3d 295, 302 (6th Cir. 2012); *United States v. Clark*, 634 F.3d 874, 876 (6th Cir. 2011). As this court has noted, however, "charges of conspiracy are not to be made out by piling inference upon inference." *United States v. Sliwo*, 620 F.3d 630, 638 (6th Cir. 2010) (quoting *Direct Sales Co. v. United States*, 319 U.S. 703, 711 (1943)). With respect to the bank fraud conspiracy conviction, the majority believes that "[t]he sheer volume of phone calls between the defendants in 2007 suggests a shift in their relationship, consistent with a burgeoning conspiracy." Perhaps, but that conclusion strikes me as

a stretch. Mr. Ouedraogo and his co-defendant Rami Saba spent more time on the telephone in June 2006 than during the month of the alleged kidnapping of Mr. Dietz. *United States v. Ouedraogo*, 837 F. Supp. 2d 720, 734 (W.D. Mich. 2011) (citing exhibits). It is undisputed that the men were exceedingly close, which makes the waxing and waning of telephone exchanges not particularly probative of criminal conduct. As the district court observed, "Given defendants' undisputed close relationship and [the] frequency of their calls, nothing incriminating can reasonably be inferred from the mere timing and pattern of calls with Ouedraogo over the course of Saba's use of the Tracfone." *Id.* at 735. Another instance of circumstantial evidence that loses its steam under close scrutiny is Mr. Ouedraogo's visit to Brooklyn, allegedly to obtain the signature of a notary. The majority fails to mention that the notary herself testified that she had never met Mr. Ouedraogo. *Id.* at 736. In short, while the evidence produced at trial reveals suspicious activity when looked at through the lens offered by the government, it falls short of proving guilt beyond a reasonable doubt.

Second, I think that a comment about the timing of the two trials is in order to understand why the belated grant of defendant's motion for a judgment of acquittal resonates with me. For whatever reason, Mr. Ouedraogo who everyone concedes was the less culpable of the two defendants was tried first. Yet, "[t]he government proofs . . . were all about Saba." *Id.* at 729. In the view of the district court, the government "employed a ruthless repetition of unconnected facts in the effort to persuade the jury of Ouedraogo's participation." *Id.* I agree with this assessment. Given its grant of defendant's motion, it is obvious that, had the district court the opportunity to revisit the matter, it would not have submitted Mr. Ouedraogo's case to the jury. Furthermore, I am

- 34 -

convinced that, had the court presided over Mr. Saba's trial first, it would have ruled differently at trial. For one, Mr. Ash's testimony, which strikes me, as it now does the district court, as improvidently allowed, would have been seen by the district court in a second trial for what it is: entitled to no weight. The district court puts it this way: "It became patently clear to the Court after his *successive* trial testimony that Ash's testimony concerning the alleged handwritten statement by Saba is not creditworthy in any respect and is entitled to absolutely no weight in this case." *Id.* at 740 (emphasis added). In short, the district court changed its view of the creditworthiness of the testimony as it progressed through the two trials. It seems to me wrong as a matter of justice to deny Mr. Ouedraogo the benefit of this increasing awareness simply because he was tried first. Yes, the jury's verdict is entitled to great deference, but in this unusual case in which the same district judge observed two nearly identical trials, I am inclined to err on the side of caution and hold, as she did, that the government failed to establish defendant's guilt beyond a reasonable doubt.

I therefore dissent from the majority's decision to reverse the grant of the motion to acquit with respect to the conspiracy counts and concur in its resolution of the substantive kidnapping count.